IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VIEW POINT MEDICAL SYSTEMS, LLC,

    *Plaintiff*,

    v.

ATHENA HEALTH, INC.,

    *Defendant*.

Civil Action No. ELH-13-1314

## MEMORANDUM OPINION

View Point Medical Systems, LLC ("View Point"), plaintiff, brought suit against athenahealth, Inc. ("Athena"), defendant, alleging six claims: fraud in the inducement (Count I); breach of contract (Count II); two claims of intentional breach of the implied covenant of good faith and fair dealing (Counts III and IV); tortious interference with prospective advantage (Count V); and "Tort Arising From Breach of Contract – Actual Malice" (Count VI). *See* First Amended Complaint (ECF 20, "Amended Complaint" or "Am. Compl.").[1] Plaintiff seeks compensatory damages, punitive damages, attorneys' fees, interest, and costs.

Defendant has filed a motion to dismiss (ECF 21), to which it has attached a legal memorandum (ECF 21-1, "Mem.") (collectively, the "Motion" or "Mot.") and several exhibits. Plaintiff opposes defendant's Motion (ECF 25, "Opposition" or "Opp."), and defendant has

---

[1] Plaintiff filed suit (ECF 2) in the Circuit Court for Baltimore City on or about February 25, 2013, against "Athena Health, Inc." Defendant timely removed on the basis of diversity of citizenship. *See* 28 U.S.C. §§ 1332(a), 1441; *see also* Notice of Removal (ECF 1). On May 9, 2013, defendant moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b). *See* ECF 7. In that motion, defendant advised that its correct name is "athenahealth, Inc." Plaintiff responded by filing a "Motion to Defer Ruling on Defendant's Motion to Dismiss" (ECF 19), indicating that it intended to file an amended complaint. In the Amended Complaint (ECF 20), plaintiff again identified the defendant as "Athena Health, Inc." In the pending motion to dismiss (ECF 21), defendant reiterates that plaintiff erred in referring to it as "Athena Health, Inc."

replied (ECF 28, "Reply").   No hearing is necessary to resolve the Motion.   *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion in part and deny it in part.

## I. Factual Background[2]

View Point, located in Baltimore City, is in the business of healthcare information technology, software development, and sales.   Am. Compl. ¶ 3.   It is owned by Jonathan Radding, who has experience working with physicians and other healthcare providers to implement such technology.  *Id.* ¶ 4.  Athena is a publicly traded corporation "that specializes in providing cloud-based practice management services to medical practices."  *Id.* ¶ 8.

Athena uses individuals or entities, known as "Lead Identifiers," to help "identify medical practices, including physician offices, hospitals and health systems" that might be interested in purchasing Athena's products and services.  Am. Compl. ¶ 9.   Lead Identifiers obtain relevant information about a medical practice, such as its size and contact information, and provide the information to Athena, which may assign a member of its sales force to approach the practice.  *Id.* ¶ 11.   Athena, which had its own sales force, was "responsible for all sales efforts once leads were generated."  *Id.* ¶ 12.   Lead Identifiers are contractors of Athena (not employees) and are paid a commission only if Athena subsequently enters into a contract with a medical practice that a Lead Identifier has located.  *Id.* ¶¶ 10, 13.

In August 2009, Radding discussed with Athena's Laurie Saltonstall the possibility of View Point becoming a Lead Identifier for Athena.  Am. Compl. ¶ 14.   At all relevant times,

---

[2] As discussed, *infra*, in considering a motion to dismiss under Rule 12(b)(6), a court accepts as true the well pleaded facts in the plaintiff's complaint, and construes them in the light most favorable to the plaintiff.  *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).   Accordingly, the factual presentation is drawn from plaintiff's Amended Complaint.

Saltonstall worked in Athena's Business Development department. *Id.*[3] Plaintiff maintains that Saltonstall "induced View Point to become a Lead Identifier for Athena under the false promise that Athena would pay substantial commissions on leads generated." *Id.* ¶ 16. View Point, "[r]elying on Ms. Saltonstall's false representations as to Athena's intent to pay commissions on leads generated," entered into an Agreement for Lead Identification (the "Agreement") with Athena on August 18, 2009. *Id.* ¶ 17.

The Agreement contains the terms of View Point's role as a Lead Identifier. Am. Compl. ¶ 17.[4] It provides for a one-year term, with automatic renewal for one year unless the parties expressly decline to renew the contract. *Id.*; Agreement ¶ 8. Paragraph 1 provides, in part: "This Agreement contains the entire agreement between [the parties] concerning sales leads identified by [View Point] for Athena. Any changes to this Agreement must be made in writing by mutual agreement of both Parties." An integration clause states: "This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof, and supersedes all prior agreements and understandings, whether explicit or implicit, which have been entered into before the execution hereof." Agreement ¶ 18.

Notably, View Point "is not required under this Agreement to provide leads to Athena; and, Athena is not required to pursue any leads provided by [View Point]." Agreement ¶ 13.

---

[3] The Amended Complaint does not provide Saltonstall's title. Nevertheless, her email signature indicates that her title was "Director, Channel Partner Alliances." *See* ECF 28-1 (email from Saltonstall to Radding dated June 9, 2010).

[4] Although View Point did not attach to the Amended Complaint either the Agreement or the subsequent Amended and Restated Agreement, both of those documents are attached to defendant's Motion. *See* Mot. Exh. A, ECF 21-2 (Agreement) and Mot. Exh. B, ECF 21-3 (Amended and Restated Agreement). As discussed, *infra*, the Court may consider those documents under Rule 12(b)(6) without converting the Motion into one for summary judgment.

And, the Agreement is "not exclusive"; "either party can enter similar arrangements with any other parties at their sole discretion." Agreement ¶ 1.

The Agreement sets forth the process by which View Point could communicate possible leads to Athena, and details how those leads could become "Qualified Leads." In particular, ¶ 2 states:

> Athena is interested in identifying as potential sales leads, physician practices to which it may sell its [administrative office workflow and billing services] (the "Services"). While this Agreement is in effect, if Lead Identifier [i.e., View Point] locates a practice that it believes would be interested in the Services, Lead Identifier may (at its sole discretion) send a letter or e-mail to the undersigned representative of Athena with the practice name, general location, size and type of business. If Athena is interested in the assistance of Lead Identifier in identifying and getting contact information regarding that practice, it will notify Lead Identifier in writing or by e-mail at the address below and will request in that letter or message specific information on contact names, information on the practice's interest in receiving information on the Services and other basic information that it reasonably needs to qualify the practice for its sales effort. When Lead Identifier provides the information requested, the practice will be deemed a "Qualified Lead" of Athena.

*See also* Am. Compl. ¶¶ 17-20. Further, the Agreement provides that, "[i]f Athena signs a contract for provision of Services with a Qualified Lead within one year after the Qualified Lead is first qualified," then View Point is entitled to receive a commission. Agreement ¶ 3; *see* Am. Compl. ¶ 21. The parties refer to this period, defined in the Agreement as a one-year period, as the "lead-protection time."

Schedule A to the Agreement establishes that any commission owed to View Point is calculated based on "the number of billing providers" of the Qualified Lead. Am. Compl. ¶ 22. More precisely, Schedule A states, in relevant part:

> Compensation shall equal (a) the number of Billing Providers (as defined in the contract between Athena and the Qualified Lead*) that are registered by the Qualified Lead on Athena's system for Services at the time that the Qualified Lead first goes live on that system multiplied by (b) $1000.00.

The Agreement lacks any notification process regarding the creation or status of a Qualified Lead. As noted, it provides that once a Lead Identifier supplies certain information in response to a request by Athena, the lead will be "deemed" a Qualified Lead. Agreement ¶ 2. However, the Agreement does not require Athena to notify the relevant Lead Identifier once it believes a Qualified Lead has been created, nor does it indicate how notice is to be provided. Moreover, the Agreement does not specify how a Lead Identifier is to confirm the status of its leads with Athena.

After the Agreement was executed, View Point worked to identify medical practices that might be interested in purchasing Athena's services. Am. Compl. ¶ 24. On February 8, 2010, Radding sent an email to Saltonstall with the subject "New Lead," in which Radding provided general background information on the healthcare provider Health Management Associates ("HMA"), including its size, location, and type of business. *Id.* ¶ 26. HMA is large provider, with 70 hospitals located in 15 states and a total medical staff of more than 11,000 physicians. *Id.* It thus appears that, in the event Athena entered into a contract with HMA and all of HMA's physicians were registered on Athena's system, a qualifying Lead Identifier could be entitled to a total commission in excess of $11,000,000. *See* Agreement, Schedule A.

Also on February 8, 2010, Radding sent an email to Jennifer Ortyl at HMA in an effort to schedule a meeting between HMA and Athena. Am. Compl. ¶ 27. Attached to defendant's motion is a copy of that email, which indicates that Radding copied Saltonstall on the message. ECF 21-4. Ortyl responded to Radding that same day and told him that Athena's Geoff Payson had already contacted HMA two months earlier and that HMA had not been interested in Athena's services at that time. Am. Compl. ¶ 27. Radding then sent an email to Saltonstall, advising that HMA had indicated it was not interested in Athena's services, and asking if he

should follow up within six to twelve months. *Id.* ¶ 28. Saltonstall responded by email, also on February 8, stating: "'Please put on your radar for 12 months out.'" Radding replied: "'Will do. Thanks for getting back to me. I will do my best to get [an] introduction.'" *Id.* ¶ 29 (quoting email messages).

On May 18, 2010, Saltonstall sent Radding an email in which she asked him to provide a "complete list/spreadsheet of the various organizations and practices that he had been working with or trying to speak with to get Athena an introduction." Am. Compl. ¶ 30. Radding provided a spreadsheet entitled "Leads" that included HMA, among other organizations. He also included the date of his initial contact, as well as his contacts at HMA and contact information. *Id.* ¶ 31.

In May 2010, Radding also sought to modify the Agreement, to compensate View Point on a salaried basis and to extend the Agreement's one-year lead-protection time to two years. *Id.* ¶ 32. In an email message dated May 24, 2010, Saltonstall told Radding that Athena declined to provide a salary but would agree to the lead time extension for practices with more than 50 physicians. *Id.* ¶ 33. She added that "'we appreciate your efforts and love the introductions you are making . . . .'" *Id.* (quoting email message). Further, on May 26, 2010, Saltonstall sent an email to Radding in which she stated: "'Your leads have been great.'" *Id.* (same).

On June 2, 2010, Radding sent an email to Saltonstall with the subject "HMA Lead," in which he asked her to call "Jennifer" at HMA. Am. Compl. ¶ 34. Radding identified Jennifer as the executive assistant to HMA's Senior Vice President of Financial Operations, and he provided Saltonstall with her phone number as well as further information concerning HMA, including information about Kelly Curry, HMA's Executive Vice President and Chief Financial Officer.

Radding told Saltonstall that he had spoken to Jennifer, who was looking forward to speaking with Saltonstall.  *Id.*

The Amended Complaint indicates that Saltonstall responded to Radding's email concerning "Jennifer" on June 9, 2010, via an email with the subject "Update."  She wrote: "'Work is crazy and prevented my ability until now to provide you with an update.'"  Am. Compl. ¶ 35 (quoting email message).  In the balance of the email, Saltonstall updated Radding regarding three of his leads, including HMA.  *Id*.  The Amended Complaint asserts: "Athena considered HMA to be View Point's qualified lead as of June 9, 2010."  *Id*.

Subsequently, on July 23, 2010, Athena and View Point entered into an Amended and Restated Agreement for Lead Identification (the "Amended Agreement").  Am. Compl. ¶ 36.  As the parties had discussed via email in May 2010, the "primary difference" between the original Agreement and the Amended Agreement (collectively, the "Agreements") was that the lead-protection time for practices with more than 50 physicians (such as HMA) was extended from one year to two years.  *Id*.  According to plaintiff, the change was intended to account for the fact that, "with larger medical practices, it often took longer than one year for Athena to consummate a contract with such medical practice once the lead was deemed to be a Qualified Lead."  *Id*.

With the exception of a provision added to Schedule A, discussed *infra*, and the extension of the lead time to two years, the relevant provisions of the Agreements are identical.[5]  Like the Agreement, the Amended Agreement contains no terms obligating either party to notify the other upon belief that a Qualified Lead was created.  The Amended Agreement's revised lead time provision is found in ¶ 4:

> If Athena signs a contract for provision of Services with a Qualified Lead . . . within two years after the Qualified Lead is first qualified and that

---

[5] As such, in the Discussion, I will generally cite to the "Agreements" rather than providing separate, parallel citations to the Agreement and to the Amended Agreement.

Qualified Lead has more than 50 physicians authorized to use the Services, then Athena will pay compensation to Lead Identifier at the rate set forth in the attached Schedule A . . .[6]

Athena allegedly began discussions with HMA in 2010 regarding Athena's services. Am. Compl. ¶ 38. In May 2012, Athena and HMA entered into a contract under which HMA agreed to purchase Athena's services. According to plaintiff, Athena delayed the finalization of the contract with HMA in order to avoid paying a commission to View Point. *Id.* When Radding learned of the contract between Athena and HMA, he contacted Saltonstall, who wrote in response: "'I do not recall – nor can I find in any of our reports – any referral of HMA to you.'" Am. Compl. ¶ 40. Plaintiff maintains that it is entitled to a commission, despite Athena's refusal to recognize HMA's status as View Point's Qualified Lead. *Id.*[7]

Additional facts will be presented in the Discussion.

## II. Discussion

### A. Rule 12(b)(6) Standard of Review

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010). To survive a Rule 12(b)(6) motion, a complaint must satisfy the pleading standard articulated in Fed. R. Civ. P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.

---

[6] Defendant states in the Motion: "For the purposes of [the Motion], Athena will treat the Amended Agreement's extension of the lead-protection time from one year to two years as retroactive to leads that were initiated during the period prior to the effective date of the Amended Agreement. Athena does so without conceding that the extension of the lead-protection time was, in fact, retroactive." Mem. at 10 n.7.

[7] The Amended Complaint does not specify when Radding learned of the HMA-Athena contract, nor does it indicate exactly when this exchange between Radding and Saltonstall occurred.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 & n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted); *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Rather, to defeat a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . .") (citation omitted); *see also Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, --- U.S. ----, 132 S. Ct. 1960 (2012). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief . . . .'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted). *See Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) ("'Dismissal under Rule 12(b)(6) is

appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'") (citation omitted); *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (citation omitted).

In considering a Rule 12(b)(6) motion, the court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co.*, *supra*, 637 F.3d at 440 (citations omitted); *see, e.g., Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, --- U.S. ----, 132 S. Ct. 402 (2011). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Nor must it accept legal conclusions couched as factual allegations, *Iqbal*, 556 U.S. at 678, or legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, --- U.S. ----, 130 S. Ct. 1740 (2010). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted).

Generally, the parties' disputes of fact "cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)," *Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009), because the court must construe the well-pled facts "in the light most favorable to the nonmoving party." *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011). Put another way, a motion pursuant to

Rule 12(b)(6) typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings . . . ." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007); *see Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). If a court considers material outside of the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Under certain limited exceptions, however, a court may consider exhibits without converting the motion to one for summary judgment. For instance, a court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted); *see Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay*

*Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). Further, in resolving a motion to dismiss, a court may consider "documents which are referred to in the Complaint and upon which Plaintiff relies in bringing the action." *Biospherics, Inc. v. Forbes, Inc.*, 989 F. Supp. 748, 749-50 (D. Md. 1997), *aff'd*, 151 F.3d 180 (4th Cir. 1998); *accord Mid-Atlantic Soaring Ass'n, Inc. v. F.A.A.*, 2006 WL 1892412, at *7 (D. Md. June 29, 2006). Additionally, facts and documents subject to judicial notice may be considered by a court, without converting the motion under Rule 12(d). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir.), *cert. denied*, --- U.S. ----, 132 S. Ct. 115 (2011).

As noted, plaintiff did not attach to the Amended Complaint either the Agreement or the Amended Agreement. Nevertheless, defendant attached both documents to its Motion. *See* Mot. Exh. A, ECF 21-2 (Agreement) and Mot. Exh. B, ECF 21-3 (Amended Agreement). In its Opposition, plaintiff raises no objections to any exhibit attached to the Motion, including the two Agreements. Because the Agreements are integral to the Amended Complaint and no party disputes their authenticity, I may consider them in connection with the Motion under a Rule 12(b)(6) standard. *See Philips*, 572 F.3d at 180; *Am. Chiropractic Ass'n*, 367 F.3d at 234.

Defendant also attached to the Motion and the Reply three emails that plaintiff had referred to and quoted from in the Amended Complaint. *See* ECF 21-4 (email from Radding to Ortyl, copying Saltonstall, dated February 8, 2010); ECF 28-1 (Exh. A, email from Saltonstall to Radding, dated June 9, 2010; and Exh. B, email from Saltonstall to Radding, dated May 18, 2010). In its Opposition, plaintiff raised no objection to the email attached to defendant's Motion. Because these emails are referred to in the Amended Complaint, and because plaintiff has relied upon them in bringing suit, I may consider them under a Rule 12(b)(6) standard. *See*

*Biospherics, Inc.*, 989 F. Supp. at 749-50; *Mid-Atlantic Soaring Ass'n, Inc.*, 2006 WL 1892412, at *7.

<u>B.  Contract Claims (Counts II, II, and IV)</u>

Plaintiff's Amended Complaint contains three common law contract claims.  As an initial matter, I must determine the law applicable to those claims.

A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules.  *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007).  As to contract claims, Maryland applies the law of the state where the contract was made ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g.*, *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012).

Both Agreements contain the following choice-of-law provision:  "This Agreement is entered in Massachusetts and will be construed and governed by the laws of the Commonwealth of Massachusetts as applied to contracts made and to be performed wholly within that commonwealth."  Agreements ¶ 19.  According to defendant, Massachusetts law therefore governs as to the three contract claims (Counts II, III, and IV).  *See* Mem. at 9 n.5.  For its part, plaintiff never argues that Maryland law applies to the breach of contract claim (Count II) and, as to the implied covenant claims, states only that it "is not waiving its claim that Maryland law applies" to Count III.  Opp. at 13 n.8.  Based on the clause found in the two Agreements, as well as plaintiff's qualified acknowledgement that Massachusetts law applies, I will apply Massachusetts law to the three contract claims for purposes of ruling on defendant's Motion.

1.  Breach of contract (Count II)

In connection with the breach of contract claim in Count II, plaintiff alleges that defendant failed to pay a commission due to plaintiff pursuant to the Agreements. Specifically, plaintiff maintains that HMA was deemed to be its Qualified Lead as of June 9, 2010. By failing to pay plaintiff a commission after defendant entered into a contract with HMA in May 2012, plaintiff insists, defendant has breached the Agreements. *See* Am. Compl. ¶¶ 49-57 (Count II).

To state a breach of contract claim under Massachusetts law, a plaintiff must show (1) that the parties reached a valid and binding agreement; (2) that the defendant breached the terms of the agreement; and (3) that the plaintiff suffered damages from the breach. *See, e.g.*, *Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999); *Coll v. PB Diagnostic Systems, Inc.*, 50 F. 3d 1115, 1122 (1st Cir. 1995).

Under Massachusetts contract law, "[t]he interpretation of an unambiguous contract is a question of law for the court, as is the initial determination of whether an ambiguity exists." *Bukuras v. Mueller Group, LLC*, 592 F.3d 255, 261 (1st Cir. 2010); *accord DMP v. Fay School ex rel. Bd. of Trustees*, 933 F. Supp. 2d 214, 223 (D. Mass. 2013). "Absent an ambiguity, the court interprets a contract 'according to its plain terms,' in a manner that gives reasonable effect to each of its provisions." *Weiss v. DHL Exp., Inc.*, 718 F.3d 39, 45 (1st Cir. 2013) (citations omitted). When interpreting unambiguous contractual terms, a court disregards extrinsic evidence. *Filiatrault v. Comverse Tech., Inc.*, 275 F.3d 131, 137 (1st Cir. 2001); *Smart v. Gillette Co. Long-Term Disab. Plan*, 70 F.3d 173, 178 (1st Cir. 1995). Accordingly, "[c]ontract interpretation questions, under Massachusetts law, are ordinarily questions of law for a court; contract law, unlike tort law, thus favors judicial resolution of disputes." *Nadherny v. Roseland Property Company, Inc.*, 390 F.3d 44, 48 (1st Cir. 2004); *see McAdams v. Massachusetts Mut.*

*Life Ins. Co.*, 391 F.3d 287, 298 (1st Cir. 2004) ("the jury does not become involved when words and context alone are used, but only when extrinsic evidence is at issue").

A contract's "'[p]rovisions are not ambiguous simply because the parties have developed different interpretations of them. Genuine ambiguity requires language susceptible of more than one meaning so that reasonably intelligent persons would differ as to which meaning is the proper one.'" *Bukuras*, 592 F.3d at 262 (citation omitted); *accord Weiss*, 718 F.3d at 45 ("'A contract is not ambiguous simply because litigants disagree about its proper interpretation.' Ambiguity arises only if the language 'is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'") (citations omitted); *see also, e.g.*, *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 9 (1st Cir. 2006) (explaining that, under Massachusetts law, "[e]ven if a contract might arguably appear ambiguous from its words alone, the decision remains with the judge if the alternative reading is inherently unreasonable when placed in context").

"If a contract is ambiguous, the meaning of the ambiguous terms often, but not always, presents a question of fact for a jury." *Nadherny*, 390 F.3d at 48. At the pleading stage, if a contract is found to be ambiguous, a defendant's motion to dismiss must be denied. *Aware, Inc. v. Centillium Communications, Inc.*, 604 F. Supp. 2d 306, 310 (D. Mass. 2009).

In its Motion, defendant argues that plaintiff has failed to allege facts establishing View Point's entitlement to a commission under the terms of the Agreements. *See* Mem. at 9-13. In particular, defendant maintains that it never made a request, as required under the Agreements, in which it asked View Point to provide specified information regarding HMA. Mem. at 12. Rather, defendant merely asked plaintiff to "'put [HMA] on [its] radar for 12 months out.'" Am.

Compl. ¶ 29.  Even if Athena had made such a request, defendant maintains, plaintiff never provided it with information sufficient to create a Qualified Lead.  *Id.* at 12-13.

Plaintiff counters that Athena requested information about HMA that, under the terms of the Agreements, was sufficient to trigger HMA's eligibility to become View Point's "Qualified Lead."  It further insists that View Point provided such information to Athena.  And, View Point contends that, even absent any request from Athena, View Point provided Athena with sufficient information about HMA to create a Qualified Lead, and that Athena did, in fact, consider HMA to be View Point's Qualified Lead.  *See* Opp. at 4-12.

To resolve defendant's Motion, I must examine the relevant provisions of the Agreements.  As noted, unless a court determines that a contract is ambiguous, such that extrinsic evidence becomes relevant, the court "interprets a contract 'according to its plain terms,' in a manner that gives reasonable effect to each of its provisions." *Weiss*, 718 F.3d at 45 (citations omitted).  Although relevant language is found throughout the Agreements, the central provision is found in ¶ 2:

> While this Agreement is in effect, if Lead Identifier [i.e., View Point] locates a practice that it believes would be interested in the Services, Lead Identifier may (at its sole discretion) send a letter or e-mail to the undersigned representative of Athena with the practice name, general location, size and type of business.  If Athena is interested in the assistance of Lead Identifier in identifying and getting contact information regarding that practice, it will notify Lead Identifier in writing or by e-mail at the address below and will request in that letter or message specific information on contact names, information on the practice's interest in receiving information on the Services and other basic information that it reasonably needs to qualify the practice for its sales effort.  When Lead Identifier provides the information requested, the practice will be deemed a "Qualified Lead" of Athena.

In other words, as an initial matter, View Point is free to decide whether to bring a given healthcare practice to Athena's attention.  Agreements ¶ 2.  The Agreements make clear that View Point "may (at its sole discretion) send a letter or e-mail" to Athena, providing "the

practice name, general location, size and type of business." *Id.* As the Agreements reiterate, View Point "is not required under this Agreement to provide leads to Athena." Agreements ¶ 13. And, the arrangement between Athena and View Point is "not exclusive"; "either party can enter similar arrangements with any other parties at their sole discretion." *Id.* ¶ 1.

However, just as View Point "is not required under this Agreement to provide leads to Athena," Athena is "not required to pursue any leads provided by [View Point]." Agreements ¶ 13. The text of ¶ 2 establishes that, upon receiving initial information from View Point, Athena retains discretion to decide whether to request, in writing or via email, certain additional information that is specified the Agreements, *id.*:

> If Athena is interested in the assistance of Lead Identifier in identifying and getting contact information regarding that practice, it will notify Lead Identifier in writing or by e-mail at the address below and will request in that letter or message specific information on contact names, information on the practice's interest in receiving information on the Services and other basic information that it reasonably needs to qualify the practice for its sales effort.

Athena does not contest View Point's allegation that, on February 8, 2010, Radding sent Saltonstall an email that "gave general background information on HMA, including its location, size and type of business." Am. Compl. ¶ 26. But, Athena maintains that it never requested specified information about HMA, and thus HMA could not become View Point's Qualified Lead.

Athena argues cogently that the basic structure of the Agreements "makes eminent sense." Mem. at 11 n.8. It reasons, *id.*: "If Athena did not control the decision as to whether a Lead Identifier could attempt to turn a possible lead into a Qualified Lead, Athena would expose itself to paying multiple commissions to different Lead Identifiers for the same Qualified Lead. In addition, Lead Identifiers could make themselves eligible for commissions in cases where

Athena had its own connections with a prospective client or did not need the Lead Identifier's assistance in consummating a deal with a prospective client."

It is also salient, as plaintiff acknowledges, that Athena had independently contacted HMA in December 2009, approximately two months before Radding provided Saltonstall with the initial information about HMA in February 2010. Specifically, on February 8, 2010, Jennifer Ortyl of HMA told Radding in an email that HMA already "had been contacted by a Geoff Payson from Athena in December" and that HMA "had advised Mr. Payson that HMA was not interested at that time." Am. Compl. ¶ 27.

In its Opposition, plaintiff insists that Athena asked View Point for additional information regarding HMA, making HMA eligible to become View Point's Qualified Lead pursuant to the Agreements. Opp. at 5. To that end, plaintiff relies primarily on Saltonstall's email to Radding dated May 18, 2010, Am. Compl. ¶ 30, which defendant attached to its Reply. ECF 28-1, Reply Exh. B. In that message, Saltonstall said, *id*.:

> Can you please provide me with a complete list/spreadsheet of the various organizations and practices that you have been working with or trying to speak with to get an introduction? On this list, please name the organization, where they are located (city/state), and when you commenced contacting them. I want to make sure I have a complete list of these organizations being contacted.

Significantly, this email makes no mention of HMA. Saltonstall stated that her purpose was to "make sure that [she has] a complete list of these organizations being contacted." And, her email plainly does not request the specified information that, according to the Agreements, Athena must request in order to trigger the possible creation of a Qualified Lead. Agreements ¶ 2. Such information includes: (1) "contact names"; (2) information regarding a practice's "interest in receiving information on the Services," and (3) "other basic information that [Athena] reasonably need[ed] to qualify" any practice "for its sales effort." *Id.* Therefore,

Saltonstall's email cannot constitute a request for specified information regarding HMA within the meaning of the Agreements.

In connection with plaintiff's claim that Athena requested the specified information about HMA, plaintiff also points to email correspondence between Saltonstall and Radding on February 8, 2010. On that day, HMA's Jennifer Ortyl had told Radding that Athena had contacted HMA just two months earlier, and that HMA had not been interested in Athena's services. Am. Compl. ¶ 27. Radding informed Saltonstall on February 8 about his contact with HMA and, as noted, he emailed Saltonstall "general background information on HMA, including its location, size and type of business." *Id.* ¶ 26. In light of Ortyl's observation that Athena had already contacted HMA in December 2009, Radding asked Saltonstall whether he should contact HMA within six to twelve months. As plaintiff emphasizes, Saltonstall responded, also on February 8, 2010, and stated: "'Please keep on your radar for 12 months out.'" *Id.* ¶¶ 28-29. However, a statement in which Saltonstall merely advised Radding to keep HMA on his "radar," one year later, plainly does not amount to a request for the particular information specified in the Agreements.[8]

In other words, plaintiff has not plausibly alleged any request by Athena seeking additional information from View Point regarding HMA, such that a "Qualified Lead" could be created under the Agreements. In particular, plaintiff fails to allege any request by Athena for "contact names" at HMA, information regarding HMA's "interest in receiving information on the Services," or "other basic information that [Athena] reasonably need[ed] to qualify the

---

[8] Among other arguments, plaintiff questions why Athena would have advised View Point to keep HMA "on its radar" if, in fact, "HMA was already off the table as a possible qualified lead?" Opp. at 7. Saltonstall, of course, advised Radding to do so "'12 months out.'" Am. Compl. ¶ 29.

practice for its sales effort." *See* Agreements ¶ 2.[9]  Absent a qualifying request by Athena for that specific information, no "Qualified Lead" is created and, absent a "Qualified Lead," View Point is not entitled to a commission.

Plaintiff, perhaps recognizing the absence of any qualifying request from Athena, asserts that "[e]ven if one assumes, *arguendo*, that Athena did not request additional information from View Point regarding HMA," the reason Athena made no such request is that it "had the information that it needed as a result of information provided by View Point." Opp. at 6.  For instance, plaintiff notes that, in response to Saltonstall's email of May 18, 2010, Radding provided a spreadsheet entitled "Leads," which contained an entry for HMA that included contact information for that entity. *Id.* at 5; Am. Compl. ¶ 31.  However, any argument based on unsolicited pieces of information provided by View Point ignores the language of the Agreements, which conditions the creation of a "Qualified Lead" on a *request* by Athena for specified information.  As discussed, Saltonstall's email of May 18, 2010, never mentioned HMA nor did it seek the contact information that Radding volunteered.  Indeed, a Lead Identifier that supplies information about a particular entity in the absence of a request by Athena does so at its own peril, as a specific *request* from Athena is the prerequisite for the creation of a "Qualified Lead." Agreements ¶ 2.[10]

In a further effort to save its breach of contract claim, plaintiff argues that "Athena treated HMA as View Point's Qualified Lead," rather than merely as one of several leads that

---

[9] Because there is no allegation that Athena requested any of these three pieces of information, much less all three, it is unnecessary to decide whether a request for some, but not all, of that information would have been sufficient to trigger eligibility for a "Qualified Lead."

[10] And, notably, plaintiff raises no allegations indicating that Athena had sufficient information regarding HMA *as a result of information provided by View Point*." Opp. at 6 (emphasis added).  After all, plaintiff concedes that Athena had independently contacted HMA two months before Radding first discussed HMA with Saltonstall.

View Point (among others) was exploring. *See* Opp. at 9-11. To that end, plaintiff cites an email from Radding to Saltonstall dated June 2, 2010, with the subject "HMA Lead." In that email, Radding asked Saltonstall to contact "Jennifer," identified as the executive assistant to Stanley Mclemore, HMA's Senior Vice President of Financial Operations. Am. Compl. ¶ 34. Radding also "provided the phone number and provided additional corporate information on HMA, including information about Kelly Curry, Executive Vice President and Chief Financial Officer at HMA." *Id.* Further, Radding "indicated that he had spoken to Jennifer and that she was looking forward to talking to Ms. Saltonstall." *Id.* Critically, Athena never requested this information regarding HMA, as required for the creation of a "Qualified Lead." Agreements ¶ 2 ("Qualified Lead" created only when a Lead Identifier "provides the information *requested*" by Athena) (emphasis added). Rather, when Radding asked in February 2010 whether to contact HMA within six to twelve months, Saltonstall merely advised him to keep HMA on his "radar" one year later.

Subsequently, on June 9, 2010, Saltonstall sent an email to Radding with the subject "Update," in which she addressed three entities: Conifer Health, Lovelace Health, and HMA. Am. Compl. ¶ 35. The Amended Complaint asserts that, based on that email, "Athena considered HMA to be View Point's qualified lead as of June 9, 2010." *Id.*

Defendant attached as Exhibit A to the Reply, ECF 28-1, Saltonstall's email of June 9, 2010. The portion of the email pertaining to HMA states in full, *id.*:

> Took me a few days to get some history on this organization but finally was able to[.] We talked to this organization last year via a lead from [Redacted]. Actually, my boss met with them in addition to Dominic Sputo. At that point they informed us they had recently purchased [Redacted] and were in the process of rolling it out. We will still try to connect with them and see if there is any new opportunity but not holding out great hope. Dominic has placed a call to them

- 21 -

with a detailed message and we await a call back.  If we do not receive one, he will try again.[11]

In that same email, Saltonstall also addressed Conifer Health and Lovelace Health, updating Radding about scheduled calls and meetings with those entities.  *Id.*; Am. Compl. ¶ 35. In this email, Saltonstall never used the term "Qualified Lead," nor did she otherwise make clear whether any of the three entities were mere "leads" or "Qualified Leads."  *Id.*  The discussion of HMA never referenced any information provided by View Point, and instead recounted efforts by Athena employees, dating to the previous year, while expressing doubts about current opportunities.  Nor does plaintiff allege in the Amended Complaint that Conifer Health or Lovelace Health ever became Qualified Leads.[12]  Rather, it alleges that, simply by listing HMA as part of a subset of View Point's potential leads and supplying updates regarding those three entities, Athena conveyed that it treated HMA as View Point's Qualified Lead.[13]

---

[11] Sputo is not further identified in this message, but it appears, based on the context, that he was an Athena employee.  The redactions referenced above are found in the version of the email that Athena attached to its Reply.  Although Athena redacted the names of two entities, plaintiff's allegations in the Amended Complaint indicate that those entities are Conifer Health and Lovelace Health.

[12] In the Opposition, plaintiff indicates that Conifer Health and Lovelace Health were Qualified Leads.  *See* Opp. at 12 n.7 ("Given that View Point had two other qualified leads – Conifer and Lovelace – discovery will shed light on exactly how these two practices were deemed to be qualified leads.").  It does not explain either when or how Conifer and Lovelace became Qualified Leads, however.  Moreover, "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

[13] Notably, the Amended Agreement's revised Schedule A, titled "Compensation for Qualified Leads," contained a new provision that referenced Conifer Health and Lovelace Health, as well as ABQ Health Partners (but not HMA):

As part of the foregoing compensation, Athena shall pay Lead Identifier an advance of $4,000 within ten business days of the date on which this Agreement

To the extent that plaintiff's breach of contract action amounts to a claim that Athena implicitly waived or modified contractual requirements, its argument is undermined by ¶ 1 of the Agreements. That provision states, in part, *id.*: "This Agreement contains the entire agreement between [the parties] concerning sales leads identified by [View Point] for Athena. Any changes to this Agreement must be made in writing by mutual agreement of both Parties." Plaintiff's allegations might present a closer question if it identified some conduct by Athena conveying that HMA was View Point's Qualified Lead. However, plaintiff has not pleaded a *single* instance in which Athena stated that HMA was View Point's "Qualified Lead," or in which View Point indicated to Athena that it believed HMA constituted a Qualified Lead. Although plaintiff cites multiple communications in the Amended Complaint, the most it can offer is the email of June 9, 2010, which falls far short of salvaging a breach of contract claim where clear contractual requirements have not been met.

In sum, the text of the Agreements establishes the process by which a contact becomes a Qualified Lead. A Lead Identifier must supply initial information; Athena must then make a request for specific information; and the Lead Identifier must supply the information requested. Plaintiff has not plausibly alleged that HMA ever became its "Qualified Lead" pursuant to the terms of the Agreements; it has failed to allege that the contractual requirements were met.

---

is signed by Athena. 50% of this advance will be credited against any amounts due to Lead Identifier under this Schedule A in regard to Conifer Health Solutions, and the other 50% will be credited against any amounts due under this Schedule A to Lead Identifier in regard to Lovelace Health System or ABQ Health Partners. If Athena does not sign an agreement for the provision of the Services with (1) Conifer Health Solutions or (2) either Lovelace Health System or ABQ Health Partners during the term of this Agreement, then, in each case, 50% of the advance paid by Athena under this Schedule A will be credited against any amounts due to Lead Identifier under this Schedule A at the end of such term.

In their filings, neither party addresses this provision or the significance of its references to Conifer Health and Lovelace Health but not to HMA.

Instead, plaintiff's breach of contract claim amounts to an attempt to rewrite the terms of the Agreements, and such an effort must fail. *See, e.g.*, *Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 52 (D. Mass. 1999) ("A court 'cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its terms.'") (citation omitted); 11 Williston on Contracts § 31:5 (4th ed. updated 2013) ("[I]t is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make. A court will not rewrite the contract of the parties.") (footnote omitted); *see also Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 341 (D. Mass. 2011) ("'[i]t is no appropriate part of judicial business to rewrite contracts freely entered into between sophisticated business entities'") (quoting *RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 205 (1st Cir. 1987)) (alteration in *Dixon*). Because plaintiff has not stated a claim for breach of contract premised on Athena's failure to pay a commission, Count II must be dismissed.

2. Implied covenant of good faith and fair dealing (Counts III and IV)[14]

Plaintiff raises two claims invoking the implied covenant of good faith and fair dealing. Under Massachusetts law, the covenant of good faith and fair dealing is implied in every contract. *Latson v. Plaza Home Mortg., Inc.*, 708 F.3d 324, 326 (1st Cir. 2013) (Souter, J.) (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991)). A breach of the implied covenant occurs "'when one party violates the reasonable

---

[14] Plaintiff's original Complaint (ECF 2) contained only one implied covenant count; the allegations found in Count IV were added in the Amended Complaint. Plaintiff has not asserted quasi-contractual claims, such as an unjust enrichment claim. However, the existence of an express contract between the parties presents a substantial barrier to such a claim: "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." *Cnty. Com'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96 747 A.2d 600, 607 (2000). It appears that courts applying Massachusetts law adhere to that general principle. *See, e.g.*, *Reed v. Zipcar, Inc.*, 527 F. App'x 20, 24 (1st Cir. 2013) ("Under Massachusetts law, litigants may not 'override an express contract by arguing unjust enrichment . . . .'") (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006)).

expectations of the other.'" *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 350 (D. Mass. 2010) (quoting *Chokel v. Genzyme Corp.*, 449 Mass. 272, 276, 867 N.E.2d 325, 329 (2007)); *accord Brand Group Intern., LLC v. Established Brands Intern., Inc.*, 2011 WL 3236078, at *3 (D. Mass. July 26, 2011); *Kuchera v. Parexel Intern. Corp.*, 719 F. Supp. 2d 121, 125 (D. Mass. 2010).[15]

"[T]he purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract and that when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract." *Lass v. Bank of America, N.A.*, 695 F.3d 129, 137-38 (1st Cir. 2012) (citations and quotation marks omitted). The covenant only "governs conduct of parties after they have entered into a contract." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005) (citing *Levenson v. L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 131, 575 N.E.2d 370, 372 (1991)). Further, "to establish a violation of the covenant, '[t]here is no requirement that bad faith be shown.' Rather, one must show a lack of good faith." *Liss v. Studeny*, 450 Mass. 473, 477 n.3, 879 N.E.2d 676, 680 n.3 (2008) (quoting *Nile v. Nile*, 432 Mass. 390, 398-99, 734 N.E.2d 1153, 1160 (2000)).

---

[15] Maryland law is to the same effect. Under Maryland law, every contract contains an implied covenant of good faith and fair dealing. *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 450, 56 A.3d 170, 208 (2012); *see, e.g.*, *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 444 (4th Cir. 2001). "[U]nder the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *E. Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir. 2000) (citing, *inter alia*, *Automatic Laundry Serv., Inc. v. Demas*, 216 Md. 544, 550-51, 141 A.2d 497, 500-01 (1958)). Nevertheless, "Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. A breach of that implied covenant simply supports 'another cause of action at law, *e.g.*, breach of contract[.]'" *Cutler v. Wal-Mart Stores, Inc.*, 175 Md. App. 177, 195, 927 A.2d 1, 11 (2007) (quoting *Mount Vernon v. Branch*, 170 Md. App. 457, 471-72, 907 A.2d 373, 381 (2006), *cert. denied*, 397 Md. 397, 918 A.2d 469 (2007)).

Significantly, the implied covenant "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004). To be sure, "'[a] party may breach the covenant of good faith and fair dealing . . . without breaching any express term of th[e] contract. Otherwise, the implied covenant would be a mere redundancy.'" *Massachusetts v. Schering-Plough Corp.*, 779 F. Supp. 2d 224, 240 (D. Mass. 2011) (quoting *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005)); *see also, e.g.*, *Eigerman v. Putnam Investments, Inc.*, 450 Mass. 281, 287-90, 877 N.E.2d 1258, 1263-66 (2007) (separately analyzing whether plaintiff stated an implied covenant claim after concluding that he failed to state a breach of contract claim).

Nevertheless, courts "'are reluctant to conclude that the covenant of good faith and fair dealing has, sub silentio, provided a specific form of protection that is not mentioned in the parties' contract.'" *Merriam v. Demoulas Super Markets, Inc.*, 464 Mass. 721, 731, 985 N.E.2d 388, 397-98 (2013) (quoting *Uno Restaurants, Inc.*, 441 Mass. at 386, 805 N.E.2d at 965). In *Speakman*, 367 F. Supp. 2d at 132, the Massachusetts district court explained:

> Nor does the covenant apply where the defendant has exercised an express contractual power in good faith—that is, in a manner that comports with the parties' reasonable expectations as to performance. *Compare Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d 147, 156 (D. Mass. 2001) (no breach of covenant where franchise agreement expressly gave defendant the right to terminate the contract under the circumstances, and there was no evidence of fraud, deceit, or misrepresentation by defendant) *and Chokel v. Genzyme Corp.*, [17 Mass. L. Rptr. 83, 2003 WL 23016549, at *10 (Mass. Super. 2003)] (no breach of covenant where defendants adhered to specific contract provisions in calculating stock transfer price, there was no evidence of bad faith, and defendants disclosed pertinent information to plaintiffs)[, *aff'd*, 449 Mass. 272, 867 N.E.2d 325 (2007)] *with Anthony's Pier Four*, [411 Mass. at 471-73, 583

N.E. 2d at 820-21] (covenant breached where one party used a discretionary right under the contract as pretext to extract price concessions) *and Fortune* [*v. National Cash Register Co.*, 373 Mass. 96, 104-05, 364 N.E.2d 1251, 1257-58 (1977)] (covenant breached where employer discharged employee under an at-will employment contract before employee could collect a portion of the sales commissions owed to him).

*See also Boston Medical Center Corp. v. Secretary of Executive Office of Health and Human Services*, 463 Mass. 447, 460, 974 N.E.2d 1114, 1126-27 (2012) ("'[T]he implied covenant [of good faith and fair dealing] does not create rights or duties beyond those the parties agreed to when they entered into the contract.'") (quoting *Curtis v. Herb Chambers I-95, Inc.*, 458 Mass. 674, 680, 940 N.E.2d 413, 419 (2011)); *Chokel*, 449 Mass. at 276, 867 N.E.2d at 329 (the covenant "does not supply terms that the parties were free to negotiate, but did not"); *Ayash v. Dana-Farber Cancer Institute*, 443 Mass. 367, 385, 822 N.E.2d 667, 684 (2005) ("The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives. The scope of the covenant is only as broad as the contract that governs the particular relationship.").

In Count III, plaintiff alleges that Athena "intentionally and wrongfully delayed entering into a contract with HMA in an egregious and bad faith scheme to deny View Point its rightful commission." Am. Compl. ¶ 61; *see also id.* ¶ 38 ("Between 2010 and 2012, Athena intentionally and wrongfully delayed the finalization of the contract with HMA in order to avoid paying View Point the contractually-promised commission as set forth in the Agreement and Amended Agreement.").

In support of its claim, plaintiff alleges, upon information and belief, that Athena and HMA began discussions regarding the purchase of Athena's services at some unspecified time in 2010. Am. Compl. ¶ 60. Plaintiff also asserts that Athena "knew that if it executed" a contract with HMA "within two years of when HMA was deemed a qualified lead, it would have to pay a

substantial commission to Plaintiff." According to plaintiff, "Athena considered HMA to be View Point's qualified lead as of June 9, 2010." Am. Compl. ¶ 35.

Significantly, as plaintiff recognizes, it often took more than one year, even after Athena had sufficient information to create a "Qualified Lead," for Athena to finalize a contract with a customer, particularly a large one. *See id.* ¶ 36 ("with larger medical practices, it often took longer than one year for Athena to consummate a contract with such medical practice once the lead was deemed to be a Qualified Lead"). According to plaintiff, the very purpose of the Amended Agreement was to extend View Point's general lead-protection time from one to two years, to account for this circumstance. *See id.* And, according to plaintiff's own characterization, HMA "is a large health care provider," with more than 11,000 physicians found across 70 hospitals located in 15 states. Am. Compl. ¶ 26.

In light of plaintiff's own allegations, its claim that Athena purposefully delayed finalizing the HMA contract in an effort to deny View Point a commission is facially incorrect; by plaintiff's own account, Athena and HMA entered into a contract by May 2012, *less than* two years after View Point maintains that HMA became its Qualified Lead. In other words, based on plaintiff's own allegations, the Athena-HMA contract was finalized *within* the two-year lead protection window that plaintiff maintains was applicable. Therefore, plaintiff has not identified a delay by Athena that had any effect on its alleged obligation to View Point.

In sum, plaintiff pleads no facts in support of its allegation that Athena delayed its contract with HMA. The allegations it offers are insufficient to survive dismissal. *See Iqbal*, *supra*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" ) (quoting Fed. R. Civ. P. 8(a)(2)); *Aziz v. Alcolac, Inc.*,

658 F.3d 388, 391 (4th Cir. 2011) ("To survive a motion to dismiss pursuant to Rule 12(b)(6), plaintiff's '[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudg[ing] their claims across the line from conceivable to plausible.'") (quoting *Twombly*, *supra*, 550 U.S. at 555).

In Count IV, plaintiff alleges that Athena "intentionally and wrongfully utilized the lead information provided by View Point while not specifically requesting in writing information necessary to the contractual formation of a qualified lead." Am. Compl. ¶ 68. According to plaintiff, Athena "intentionally led [View Point] to believe that HMA was its qualified lead in order to convince [View Point] to continue its efforts to obtain information on HMA, which would lead to Athena securing a contract with HMA." *Id.* ¶ 69. Further, Athena allegedly "utilized and benefitted from the information provided by [View Point], while intentionally refraining from fulfilling its obligations under the contract to specifically request in writing the information necessary to the contractual formation of a qualified lead." *Id.*

In its Motion, defendant argues, *inter alia*, that Count IV represents "an attempt to foist an obligation onto Athena to create a Qualified Lead based on information provided by View Point," even where the contractual requirements for a Qualified Lead have not been met. Mem. at 16. As noted, courts are unwilling to allow the implied covenant to create protections that are absent from a contract itself. *See, e.g.*, *Merriam*, 464 Mass. at 731, 985 N.E.2d at 397-98; *Uno Restaurants, Inc.*, 441 Mass. at 386, 805 N.E.2d at 965.

That principle limits plaintiff's potential arguments. For instance, as alleged in the Amended Complaint, plaintiff's theory is partially grounded in the notion that Athena "intentionally refrain[ed] from fulfilling its *obligations* under the contract to specifically request in writing the information necessary to the contractual formation of a qualified lead." Am.

Compl. ¶ 69 (emphasis added). This argument is contrary to the plain language of the Agreements; after View Point supplied initial information regarding a given practice, Athena was under no obligation to request further information. Agreements ¶ 2 ("*If Athena is interested in the assistance* of [View Point] in identifying and getting contact information regarding that practice" then it may request such information) (emphasis added). In the Opposition, plaintiff distances itself from that allegation, stating that it "is not arguing that Athena must always request more information on a medical practice" that is brought to its attention. Opp. at 15.

To cite another example, the Agreements clearly do not provide for a commission every time a Lead Identifier locates a practice and supplies information to Athena. As plaintiff concedes, "[t]here is nothing in the Agreement that provides that the first person to suggest a medical practice for Athena to contact is automatically granted the qualified lead." Opp. at 14.

Notwithstanding those limitations, in my view plaintiff has stated a plausible claim in Count IV for breach of the implied covenant. It has done so by alleging that Athena intentionally avoided making a specific request that could have triggered the creation of a Qualified Lead, while nevertheless encouraging and seeking to benefit from View Point's assistance. Such conduct by Athena includes communicating with View Point about HMA; requesting an update regarding View Point's leads and accepting contact information supplied by Radding; telling View Point in May 2010 that it "appreciate[d View Point's] efforts," that it "love[d] the introductions" View Point was making, and that View Point's "leads have been great"; and, in February 2010, encouraging View Point to keep HMA on its "radar" and advising it to contact HMA twelve months later.

As explained, *supra*, the structure of the Agreements is formulaic, and if the Agreements' requirements are not met, no Qualified Lead is created. As such, under the terms of the

Agreements, a Qualified Lead is not created where Athena uses information that a Lead Identifier offers for Athena's initial consideration—even if, for instance, that information exceeds "the practice name, general location, size and type of business" specified in the Agreements. Agreements ¶ 2. Nor is a Qualified Lead created if, in the course of subsequent discussions with Athena, a Lead Identifier volunteers additional information about a particular lead. Under the Agreements, Athena is free to engage in discussions with the actual leads, to communicate with its Lead Identifiers regarding their leads, and to encourage those Lead Identifiers' efforts. *See, e.g.*, Am. Compl. ¶ 33 (alleging that Saltonstall told Radding in May 2010 via email messages that "we appreciate your efforts and love the introductions you are making" and that "[y]our leads have been great"). As long as Athena makes no request for "contact names," information concerning a practice's "interest in receiving information on" Athena's services, and "other basic information that [Athena] reasonably needs to qualify the practice for its sales effort," no Qualified Lead is created. *See* Agreement ¶ 2. But, it would not be appropriate for Athena to acquire information from its Lead Identifiers and benefit from that information while deliberately failing to make any request for information that would trigger the creation of a Qualified Lead, in order to insulate itself from responsibility for a commission.

As indicated, the Agreements lack a notification process by which the parties were to confirm the creation of a Qualified Lead. The omission is striking, given that the distinction between a mere "lead" and a "Qualified Lead" is crucial: if a lead becomes a Qualified Lead, the Lead Identifier is entitled to a commission from Athena; without a Qualified Lead, no compensation is due. Plaintiff acknowledges as much in its Opposition, stating: "Under the terms of the [A]greement[s], a Lead Identifier can only obtain compensation if a medical practice

is deemed a qualified lead. Otherwise, no compensation is available." *See* Opp. at 7.[16] Nor is it apparent either how or whether, once an entity becomes a Qualified Lead of one Lead Identifier, Athena conveys that information to its *other* Lead Identifiers. Absent such notification that an entity (such as HMA) is no longer eligible to become a Qualified Lead, a Lead Identifier (like View Point) might continue to devote efforts with respect to that lead.[17]

As discussed, plaintiff has not pleaded a viable breach of contract claim under Count II. Nevertheless, it remains unclear whether Athena "'violate[d] the reasonable expectations of'" plaintiff. *Noonan*, *supra*, 723 F. Supp. 2d at 350 (quoting *Chokel*, *supra*, 449 Mass. at 276, 867 N.E.2d at 329). In my view, it is improper for the Court to make that determination at this stage; discovery is warranted. Because plaintiff has plausibly alleged a violation of the implied covenant of good faith and fair dealing, Count IV may proceed.

### C. Tort Claims (Counts I, V, and VI)

In the Amended Complaint, plaintiff also raises three tort claims: fraud in the inducement (Count I); tortious interference with prospective advantage (Count V); and "Tort Arising From Breach of Contract – Actual Malice" (Count VI). As with the contract claims, I must determine the applicable law.

Regarding tort claims, Maryland applies the law of the state where the alleged harm occurred ("*lex loci delicti*"). *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Auth.*,

---

[16] Although the lack of a notification provision in the Agreements is problematic for the reasons described here, it is also curious that, based on plaintiff's allegations, Radding apparently never asked Athena during 2010 whether or not HMA was View Point's "Qualified Lead."

[17] It appears that a given entity can be the Qualified Lead of, at most, only one Lead Identifier at a given point in time. Although the Agreements do not clearly establish as much, plaintiff's argument in its Opposition is based on that premise. Opp. at 7-8 & n.4. In its Reply, defendant does not dispute that characterization, and its Motion suggests the same. *See* Mem. at 11 n.8 ("If Athena did not control the decision as to whether a Lead Identifier could attempt to turn a possible lead into a Qualified Lead, Athena would expose itself to paying multiple commissions to different Lead Identifiers for the same Qualified Lead.").

412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).  Given View Point's location, the alleged harm would have occurred in Maryland, and plaintiff relies on Maryland law in connection with its tort claims.  *See* Opp. at 17-23.  In its Motion, defendant states that, for purposes of the Motion, it "will assume that Maryland, rather than Massachusetts law," applies to Counts I, V, and VI, but "reserves its rights to argue that Massachusetts law should apply to the other counts in the Amended Complaint."  Mem. at 20 n.13.  In light of these considerations, I will apply Maryland law to Counts I, V, and VI.

View Point's three tort claims all sound in fraud.  Such claims implicate the heightened pleading standard of Fed. R. Civ. P. 9(b), which states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *See Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland state law claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)"); *see, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims.").

Under Rule 9(b), a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted).  In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'"  *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).  The Rule serves several purposes:

"First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . .  Second, Rule

> 9(b) exists to protect defendants from frivolous suits. A third reason for the rule
> is to eliminate fraud actions in which all the facts are learned after discovery.
> Finally, Rule 9(b) protects defendants from harm to their goodwill and
> reputation."

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)). Moreover, the plain text of Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. Thus, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

1. Fraudulent inducement (Count I)

In Count I, plaintiff alleges that Athena made false representations for the purpose of inducing View Point to enter into the original Agreement and, subsequently, into the Amended Agreement. Am. Compl. ¶ 44. In particular, Saltonstall allegedly made "false representations of material fact" on behalf of Athena, in which she stated, "among other things, that [Athena] intended to perform its obligations under the [Agreements], specifically that it intended to pay the commission promised in the Agreement and, later, in the Amended Agreement." Am. Compl. ¶ 43. In the Motion, defendant argues that plaintiff's fraudulent inducement claim

amounts to nothing more than a claim to a commission to which it was not entitled under the Agreements, and that plaintiff's allegations fail to meet the particularity requirement of Fed. R. Civ. P. 9(b). Mot. at 2.

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). In other words, "fraudulent inducement is simply a means of committing fraud." *Id.*, 832 A.2d at 261-62. In Maryland, to prevail on a fraud claim, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 544, 921 A.2d 245, 254 (2007) (quotation marks and citation omitted); *see also Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Hoffman v. Stamper,* 385 Md. 1, 16, 867 A.2d 276, 285 (2005); *Nails v. S & R*, 334 Md. 398, 415-16, 639 A.2d 660, 668-69 (1994). And, the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). Moreover, the "misrepresentation must be made with the deliberate intent to deceive." *Sass*, 152

Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)). And, the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

"The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674, 886 A.2d 924, 929 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307, 334 A.2d 133, 136 (1975)). "In fraudulent inducement cases, a defrauded party may elect between two remedies, which are exclusive." Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 3.92, at 346 (5th ed. 2013). "Persons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the contract or to ratify the contract and seek damages, either affirmatively or by recoupment." *Sonnenberg v. Sec. Mgmt. Corp.*, 325 Md. 117, 127, 599 A.2d 820, 823 (1992).

Notably, "'fraud cannot be predicated on statements which are merely promissory in nature, or upon expressions as to what will happen in the future.'" *Sass*, 152 Md. App. at 438, 832 A.2d at 265 (quoting *Levin v. Singer*, 227 Md. 47, 63, 175 A.2d 423, 432 (1961)). Rather, the "failure to fulfill a promise is merely a breach of contract." *Kerr v. Johns Hopkins University*, 2011 WL 4072437, at *7 (D. Md. Sept. 12, 2011) (quoting *Sass*, 152 Md. App. at 438, 832 A.2d at 265), *aff'd*, 473 F. App'x 246 (4th Cir. 2012), *cert. denied*, --- U.S. ----, 133 S. Ct. 941 (2013). Nevertheless, "[s]imply because a statement concerns an event that may occur in the future does not preclude liability based on fraud." *Aloi v. Moroso Inv. Partners, LLC*, 2012 WL 4341741, at *4 (D. Md. Sept. 20, 2012) (citing *Bagel Enter., Inc. v. Baskin & Sears*, 56 Md.

App. 184, 203, 467 A.2d 533, 542-43 (1983) ("Maryland recognizes an action for fraud based on fraudulent representations of future intentions.")).  Accordingly, "an action for fraud may not be dismissed on this basis if the alleged fraud is based on a defendant's promise that is made with the present intention not to perform that promise." *Aloi*, 2012 WL 4341741, at *4 (citing *Sass*, 152 Md. App. at 436, 832 A.2d at 264).  Specifically, Maryland courts have recognized that "a promise made to induce another to execute a contract, which the promisor never intended to perform, may create liability for fraud."  *Sass*, 152 Md. App. at 432, 832 A.2d at 262 (citing *Councill v. Sun Ins. Office*, 146 Md. 137, 150, 126 A. 229, 234 (1924)).

According to plaintiff, Athena induced View Point to enter into the Agreements in order to "take unfair advantage of Plaintiff's extensive experience in the field of health technology, electronic medical records and related technology in order to generate more business, and more income, for Athena."  Am. Compl. ¶ 45.  As noted, plaintiff's fraudulent inducement claim is premised on statements allegedly made by Saltonstall, indicating that Athena "intended to perform its obligations" and "pay the commission" due under the Agreements, even though "Athena never had any intention of honoring its obligations in the Agreement related to the payment of commissions."  Am. Compl. ¶¶ 23, 43.  Saltonstall allegedly made those statements in August 2009, leading up to the execution of the original Agreement on August 18 of that month, and between May 2010 and July 23, 2010, when the parties executed the Amended Agreement.  *Id.*; *see also id.* ¶ 37 (alleging that Athena "fraudulently induced View Point to enter into the Amended Agreement").  Plaintiff maintains that it "relied with justification upon the misrepresentations in entering into the [Agreements] and performing its obligations under" those Agreements.  *Id.* ¶ 47.

The fraudulent inducement count suffers from several flaws. For one, the count is premised on the claim that Saltonstall falsely represented that Athena "intended to perform its obligations . . . and to pay the commission" under the Agreements. Am. Compl. ¶ 43. However, plaintiff has failed to state a claim for breach of contract. In other words, plaintiff has not plausibly alleged its entitlement to any commission pursuant to the terms of the Agreements. *See First Union Nat. Bank v. Steele Software Systems Corp.*, 154 Md. App. 97, 137, 838 A.2d 404, 427 (2003) ("Fraudulent intent not to fulfill a performance requirement that [the defendant-appellant] never undertook[] does not support a cause of action for fraudulent inducement."). Therefore, plaintiff has not plausibly alleged how Saltonstall's statements, which, according to plaintiff, indicated that Athena would pay commissions due under the terms of the Agreements, could be actionable; the commission was not due under the Agreements.

In support of plaintiff's contention that it has stated an actionable fraudulent inducement claim, plaintiff refers to various communications between Athena and View Point alleged in the Amended Complaint. *See* Opp. at 19. However, *none* of those communications dates from 2009, when the parties entered into the original Agreement. Plaintiff also quotes one message from Saltonstall to Radding, dating from no earlier than May 2012, in which she states: "'I do not recall – nor can I find in any of our reports – any referral of HMA to you.'" Am. Compl. ¶ 40 (quoted in Opp. at 19). That statement was made approximately three years after the parties entered into the original Agreement. Accordingly, it does nothing to illuminate Athena's intentions in 2009, when the parties entered into the initial Agreement. *See* Opp. at 19.

Plaintiff also insists that it was fraudulently induced to enter into the Amended Agreement, which became effective July 23, 2010, but that argument also falls flat. As defendant notes, the purpose of that agreement was to extend the lead-protection time, for the

benefit of View Point. Accordingly, plaintiff has not plausibly alleged how it "suffered compensable injury resulting from" any misrepresentation that led it to enter into the Amended Agreement. *See Moscarillo*, 398 Md. at 544, 921 A.2d at 254. Moreover, the communications dating from 2010 that plaintiff cites show, at most, an effort by Athena to obtain plaintiff's assistance with respect to one particular entity, HMA.[18] But, plaintiff does not plausibly allege how those statements reflected any intention on the part of Athena not to pay plaintiff commissions to which it was due under the terms of the Agreements. Nor can an ambiguous statement made by Saltonstall in 2012 save plaintiff's fraudulent inducement count from dismissal, in the absence of any allegation showing that Saltonstall's statements in 2010 were false. *See Aloi*, 2012 WL 4341741, at *5 (dismissing fraudulent inducement claim where plaintiff offered insufficient allegations that defendant never intended to satisfy a contractual condition). Dismissal of Count I is warranted.[19]

## 2. Tortious interference (Count V)

In Count V, plaintiff brings a claim for tortious interference with prospective economic advantage.[20] In particular, plaintiff alleges that Athena's refusal to pay a commission caused "substantial economic loss and damages, and irreparable damage to its existing and prospective business" in the healthcare technology field, which Athena allegedly "knew that View Point was working diligently to develop and maintain." According to plaintiff, Athena acted "with the

---

[18] Notably, all of plaintiff's efforts with respect to HMA that are identified in the Amended Complaint predate July 23, 2010, the effective date of the Amended Agreement.

[19] In the event plaintiff chooses to file an amended complaint, it may attempt to reframe its fraud claim, consistent with its allegations that defendant deliberately failed to trigger contractual requirements so as to avoid liability.

[20] In Maryland, "tortious interference with prospective advantage" and "intentional interference with a business relationship" are two names for one tort. *See havePOWER, LLC v. General Electric Co.*, 183 F. Supp. 2d 779, 785 (D. Md. 2002) (noting that the tort of tortious interference with prospective advantage "has come to be known" as "tortious interference with business relationships).

improper purpose of causing damage to View Point," "without justifiable cause," and that its "actions were willful, wanton, knowing, deliberate, intentional, and done with ill will and actual malice and calculated to cause damages to Plaintiff's business." Am. Compl. ¶¶ 74-78.

The tort of intentional interference with contractual or business relations is "well-established in Maryland." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296, 639 A.2d 112, 116 (1994). It requires a plaintiff to prove "'(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'" *Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 628-29, 831 A.2d 49, 53 (2003) (quoting *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962, 964 (1909)) (further citation and quotation marks omitted). The tort "arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer (D)." *K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 154, 557 A.2d 965, 973 (1989); *see also, e.g.*, *Alexander & Alexander, Inc. v. B. Dixon Evander and Associates*, 336 Md. 635, 650 A.2d 260, 265 (1994) ("[A] party to contractual relations cannot be liable for the interference tort based on those contractual relations. The tort is aimed at the person who interferes with the contract, and not at one of the contracting parties.").

Courts have identified "two general manifestations" of the tort. *Macklin*, 334 Md. at 297, 639 A.2d at 117. The first manifestation is often described as "'inducing the breach of an existing contract,'" and the second, "'more broadly,'" constitutes "'maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract.'" *Blondell v. Littlepage*, 413 Md. 96, 125, 991 A.2d 80, 97 (2010) (citation omitted). The parties are in apparent agreement that plaintiff is pursuing a theory of the broader, second type.

Notably, liability will only attach to interference that is either "wrongful or unlawful." *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 90 (1992) (citation omitted); *see Gabaldoni v. Wash. Cnty. Hosp. Ass'n*, 250 F.3d 255, 263 (4th Cir. 2001) (citing *Travelers*, 326 Md. at 343, 605 A.2d at 90). The Maryland Court of Appeals has provided an illustrative list of the "types of wrongful or unlawful acts that could form the basis" for the second manifestation of the tort, including "'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 153, 757 A.2d 108, 113 (2000) (quoting *Alexander & Alexander, Inc.*, 336 Md. at 657, 650 A.2d at 271); *see Volcjak v. Washington Cnty. Hosp. Ass'n*, 124 Md. App. 481, 512-13, 723 A.2d 463, 479 (1999). Moreover, "to establish causation in a wrongful interference action, the plaintiff must prove that the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference." *Med. Mut. v. B. Dixon Evander & Assocs.*, 339 Md. 41, 54, 660 A.2d, 433, 439 (1995). Although, as a general matter, "wrongful conduct is incapable of precise definition," it is well established that when a party acts within its rights, that conduct is not wrongful "as a matter of law." *Macklin*, 334 Md. at 301-02, 639 A.2d at 119 (citing *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 765, 511 A.2d 492, 498 (1986)).

As plaintiff's Opposition reflects, its theory amounts to a claim that, because it devoted time and effort to pursuing the HMA lead in order to earn a commission under the Agreements, "to the exclusion of other business opportunities," View Point lost the opportunity to "engage in business ventures with other providers" in the industry. *See* Opp. at 21-22. However, as defendant notes, Maryland courts have "'refused to adopt any theory of tortious interference with contract or with economic relations that converts a breach of contract into an intentional tort.'"

*Hearn Insulation & Improvement Co., Inc. v. Carlos Bonilla*, 2010 WL 3069953, at *10 (D. Md. Aug. 5, 2010) (quoting *Alexander & Alexander, Inc.*, *supra*, 336 Md. at 654, 650 A.2d at 269-70); *see Alexander & Alexander, Inc.*, 336 Md. at 656, 650 A.2d at 270 ("[A]n act of tortious interference with economic relations is characterized by the defendant's specific purpose to interfere, and that acts which incidentally affect another's business relationships are not a sufficient basis for the tort."); *Spengler v. Sears, Roebuck & Co.*, 163 Md. App. 220, 243, 878 A.2d 628, 642 (2005) (no claim for the tort of interference exists "'when there is merely a breach of contract that has an incidental effect on the plaintiff's business relations with third parties'") (quoting *Volcjak*, 124 Md. App. at 512-13, 723 A.2d at 479). Because plaintiff's claim represents little more than an effort to refashion an alleged breach of contract as a tortious interference claim, Count V must be dismissed.

### 3. "Tort Arising From Breach of Contract – Actual Malice" (Count VI)

In Count VI, plaintiff alleges (1) that the parties had "valid and enforceable" Agreements, and (2) that Athena "acted without legal justification or excuse but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure View Point." Am. Compl. ¶¶ 80-81. The parties offer sharply different views of this count. Defendant argues that no such claim exists under Maryland law, Mem. at 26, while plaintiff insists that, through Count VI, it has stated a valid claim for a tortious breach of contract under which it may recover punitive damages. Opp. at 22.

"'The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'" *Jacques v. First Nat'l Bank*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986) (quoting *Heckrotte v. Riddle*, 224 Md. 591, 595, 168 A.2d 879, 882 (1961)); *see Mesmer v. Maryland*

*Auto. Ins. Fund*, 353 Md. 241, 725 A.2d 1053, 1058 (1999) ("A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis."); *Wilmington Trust Co. v. Clark*, 289 Md. 313, 328-29, 424 A.2d 744 (1981) ("Mere failure to perform a contractual duty, without more, is not an actionable tort.").

Further, it is well established in Maryland that although punitive damages "are recoverable in tort actions arising out of contractual relationships where actual malice is present," they "cannot be awarded in a pure breach of contract case." *Sims v. Ryland Group, Inc.*, 37 Md. App. 470, 475, 378 A.2d 1, 4 (1997); *see Jacques*, 307 Md. at 545, 515 A.2d at 765 ("[W]here actual malice is shown, punitive damages may be awarded in a tort action but not in an action for breach of contract."); *General Motors Corp. v. Piskor*, 281 Md. 627, 634, 381 A.2d 16, 20 (1977) ("If [defendant] is correct in its assertion that the torts complained of in this case arose out of a contractual relationship between it and [plaintiff], then it would have been incumbent upon [plaintiff] to prove that [defendant's] conduct was motivated by actual malice in order to recover punitive damages."); *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586, 636, 14 A.3d 1193, 1222 (2011); *see also Biktasheva v. Red Square Sports, Inc.*, 366 F. Supp. 2d 289, 295 (D. Md. 2005) ("In Maryland, punitive damages are not available in a pure action for breach of contract, even if the breach is malicious. In a tort action, a plaintiff must prove that a defendant had actual malice in order to obtain punitive damages." (citations omitted)).[21]

---

[21] Maryland courts have defined "'actual malice' as 'conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud.'" *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 264, 841 A.2d 828, 837 (2004) (quoting *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 460, 601 A.2d 633, 652 (1992)); *see also Biktasheva*, 366 F. Supp. 2d at 296 ("Actual malice 'has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" (citation omitted)). Thus, "'negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual

In its Motion, defendant asserts that no claim for "tort arising from breach of contract" exists under Maryland law. It characterizes Count VI as a misplaced effort to invoke the principle that a plaintiff may recover punitive damages for a tort arising from a contractual breach, where the defendant can be shown to have acted with actual malice. Mem. at 26. Because plaintiff fails to adequately plead any tort arising from the contractual relationship between Athena and View Point, defendant maintains that Count VI must fail. Mem. at 27.

In response, plaintiff does not argue that Count VI constitutes an independent cause of action. Instead, plaintiff counters that its other fraud counts can withstand dismissal: "If View Point has sufficiently plead[ed] its fraud counts, then of course Count VI cannot be dismissed for insufficient pleading of those counts." Opp. at 22. However, as explained above, plaintiff's fraud claims in Counts I and V must be dismissed. As such, even if Count VI could, as plaintiff believes, support his claim to punitive damages in connection with some separate count, both fraud counts fail to state a claim. And, to the extent plaintiff is attempting to use Count VI as a means to recover punitive damages in connection with a breach of contract claim, that effort must fail as a matter of law. *See, e.g.*, *Jacques*, 307 Md. at 545, 515 A.2d at 765. Count VI is dismissed.

### D. With or Without Prejudice

The only remaining question is whether plaintiff should be granted leave to amend, which it requests in the Opposition. *See* Opp. at 23 (seeking, as an alternative, leave to amend). *See also* Fed. R. Civ. P. 15(a)(2). Defendant opposes that request, seeking dismissal with prejudice. Reply at 13. Denial of leave to amend is appropriate where "'the amendment would be

---

malice].'" *Darcars Motors of Silver Spring, Inc.*, 379 Md. at 264, 841 A.2d at 837 (alteration in original) (quoting *Owens-Illinois, Inc.*, 325 Md. at 463, 841 A.2d at 837). Actual malice must be established by clear and convincing evidence. *Darcars Motors of Silver Spring, Inc.*, 379 Md. at 264, 841 A.2d at 837; *see Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 652, 709 A.2d 1222, 1226 (1998).

prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *Edwards*, *supra*, 178 F.3d at 242 (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)); *accord Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 409 (4th Cir. 2013); *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 257 (D. Md. 2013).

As previously noted, plaintiff has already had one opportunity to amend; it filed the Amended Complaint after defendant filed its first motion to dismiss. *See* ECF 7 (motion to dismiss) and ECF 20 (Amended Complaint). Nevertheless, discovery has not commenced, and it is not obvious that amendment of plaintiff's factual allegations or legal claims necessarily would be futile. Under these circumstances, it is appropriate to allow a further opportunity to amend the complaint, to remedy the deficiencies identified in this Memorandum.

### III. Conclusion

For the foregoing reasons, defendant's Motion (ECF 21) will be granted in part and denied in part. An Order implementing my ruling follows.

Date:  March 28, 2014                                     _____/s/_____
                                                                                  Ellen Lipton Hollander
                                                                                  United States District Judge